ST. AUGUSTINE TRAWLERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; VELTON J: O'NEAL and PEARL W. O'NEAL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
St. Augustine Trawlers v. Commissioner
Docket Nos. 46843-86, 48350-86.
United States Tax Court
T.C. Memo 1992-148; 1992 Tax Ct. Memo LEXIS 166; 63 T.C.M. (CCH) 2362; T.C.M. (RIA) 92148; March 16, 1992, Filed *166 Decisions will be entered under Rule 155. James D. O'Donnell and Keith H. Johnson, for petitioners. Avery B. Cousins III, for respondent. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in Federal income tax and additions to tax for both the corporate taxpayer and the individual taxpayers as follows: St. Augustine Trawlers, Inc. (Docket No. 46843-86)
Addition to Tax
Fiscal Year Ending
Deficiency
Sec. 6653(b)
6/30/75
$ 18,224 --
6/30/76
7,822
--
6/30/77
91,360
--
6/30/78
155,829
--
6/30/79
455,148
$ 222,574
6/30/80
801,864
400,932
On November 30, 1988, respondent filed an Amendment to Answer in which she asserted the following increases in petitioner's taxable income: "cash payments of $ 400,000.00 from Archie Woody Moore, $ 400,000.00 from Ken Kiken, $ 100,000.00 from Gene Culmer, $ 90,000.00 from Jack Hemingway, $ 200,000.00 from William Wells, an unknown amount from James Murray, and additional unreported income from scrap metal and vending machine sales." The resulting increased deficiencies and additions asserted by respondent were: *167 Addition to Tax
Fiscal Year Ending
Deficiency
Sec. 6653(b)
6/30/79
$ 491,148  $ 245,574
6/30/80
1,077,864
538,932
Velton J. and Pearl W. O'Neal (Docket No. 48350-86)
Addition to Tax
Taxable Year Ending
Deficiency
Sec. 6653(b)
12/31/74
$ 4,785  $        12/31/75
23,208
--
12/31/76
74,254
--
12/31/77
60,992
--
12/31/78
17,472
--
12/31/79
432,160
216,080
12/31/80
536,160
268,080
12/31/81
1,478
--
On November 30, 1988, respondent filed an Amendment to Answer in which she asserted increases in petitioners' taxable income for all or part of the following: "cash payments of $ 400,000.00 from Archie Woody Moore, $ 400,000.00 from Ken Kiken, $ 100,000.00 from Gene Culmer, $ 90,000.00 from Jack Hemingway, $ 200,000.00 from William Wells, an unknown amount from James Murray, and additional unreported income from scrap metal in the amount of $ 21,000.00." The resulting increased deficiencies and additions asserted by respondent were: Addition to Tax
Taxable Year Ending
Deficiency
Sec. 6653(b)
12/31/79
$ 579,510
$ 289,755
12/31/80
893,510
446,755
After concessions, [1] the following issues remain *168 for decision: 1. Whether the corporate taxpayer, St. Augustine Trawlers, Inc., failed to report income for its taxable years ending June 30, 1979, and June 30, 1980; 2. If the corporate taxpayer failed to report income, whether any portion of the understatement of income and resulting underpayment of tax each year was due to fraud on its part; 3. Whether the individual taxpayers, Velton J. and Pearl W. O'Neal, failed to report income they received in 1979 and 1980; and 4. If so, whether the understatement of income and resulting underpayment of tax each year was due to fraud on the part of petitioner Velton J. O'Neal. [2]
*169 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts, the second supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. The principal place of business of the corporate taxpayer, St. Augustine Trawlers, Inc. (hereinafter Trawlers), at the time it filed its petition was St. Augustine, Florida. Trawlers was in the business of building, maintaining, and repairing shrimp boats and trawlers. After 1978, Trawlers also built dry docks and barges. Corporate Structure
Trawlers was incorporated in Florida on September 3, 1971. At the time of incorporation, petitioner Velton J. O'Neal (hereinafter O'Neal) was president, Frank D. Upchurch, Jr., was vice president, and Jerry D. Thompson [3] was secretary/treasurer. From December 29, 1971, to June 30, 1976, O'Neal was president, Jerry D. Thompson was secretary, and Joseph T. Thompson *170 [4] was treasurer. On June 30, 1976, Joseph T. Thompson also became vice president. During the June 28, 1979, board of directors meeting, O'Neal was elected president and Jerry D. Thompson was elected secretary, treasurer, and executive vice president. At the organizational meeting on September 6, 1971, Trawlers had issued 563 shares of stock to O'Neal and 375 shares to Joseph T. Thompson. Shortly thereafter, Jerry D. Thompson became a shareholder, with the result that O'Neal and Joseph T. Thompson each owned 37.5 percent of the Trawlers stock and Jerry D. Thompson owned 25 percent. In 1976, O'Neal acquired Joseph T. Thompson's interest and sold an additional 8.33 percent interest to Jerry D. Thompson (hereinafter Thompson). Thompson gave O'Neal a promissory note, *171 but made payments only for the first and second years. From 1976 until the sale of Trawlers on January 6, 1981, O'Neal owned 66.67 percent and Thompson owned 33.33 percent of the stock. Sale and Subsequent Reacquisition of Trawlers
In December of 1980, O'Neal and Thompson negotiated with David L. Smeaton for the sale of Trawlers stock. The negotiated terms were $ 5 million, plus an additional $ 2 million to O'Neal and an additional $ 1 million to Thompson. On January 6, 1981, O'Neal and Thompson sold their stock in Trawlers to Smeaton. The sales agreement reflected a sales price of only $ 5 million, but O'Neal and Thompson also received notes for the additional amounts. The additional amounts were to be paid to a bank in the Cayman Islands. O'Neal told Thompson that they would not have to pay taxes on the $ 3 million portion of the purchase price that was paid in the Cayman Islands. Between January 6, 1981, and May 6, 1981, when he reacquired the corporation, O'Neal held the stock pursuant to a pledge agreement. Immediately after the sale in January 1981, Fernando A. Hernandez was appointed president of Trawlers and Robert E. Luedke was appointed vice president, chief *172 executive officer, and secretary. O'Neal and Thompson were retained to assist in the transition of ownership. In February of 1981, however, Smeaton and Luedke discharged Thompson, first giving him a 30-day suspension letter and then terminating his employment during that 30-day period. At that time, Bruce Hoover, an independent certified public accountant and consultant to Smeaton, became suspicious when he discovered large credit memos that were being used to offset Trawlers' accounts receivable. He asked the accounting firm of Peat, Marwick, Mitchell & Co. (hereinafter Peat, Marwick) to perform an independent review of Trawlers' credit memos, boat sales contracts, accounts receivable, checks, and other records. On March 5, 1981, Hoover and Smeaton met with O'Neal. When Hoover informed O'Neal of the accounting discrepancies, O'Neal told Hoover that he and Thompson had split some of the cash coming into Trawlers. The conclusions reached by Peat, Marwick essentially confirmed those reached by Hoover. On March 23, 1981, Peat, Marwick reported several problems to Luedke, including a $ 1.2 million overstatement in accounts receivable and Trawlers' use of double (inflated) boat *173 contracts, which will be discussed below. These double boat contracts resulted in a fraud on the banks that financed the boat purchases. Accordingly, Luedke reported the matter to the Federal Bureau of Investigation (FBI), which initiated an investigation, particularly since one of the transactions was financed by an agency of the United States Government. During this same time period, the Internal Revenue Service (IRS), independently and as a result of computer selection for audit, began a civil examination of Trawlers' corporate tax returns. By May of 1981, Smeaton was trying to renegotiate the January purchase agreement for Trawlers' stock. Since Smeaton had made only the first payment due on the notes, O'Neal brought suit to reacquire the shares and regain control of Trawlers. Pursuant to a local court order, the Trawlers shares were returned to O'Neal and Thompson in the spring of 1981. In October of 1981, O'Neal purchased Thompson's interest in Trawlers. In return for his stock, O'Neal paid Thompson $ 100,000 and gave him a $ 500,000 promissory note. However, he stopped payments on the note after 5 or 6 months. Thompson then sued O'Neal because of the default on the *174 note. O'Neal counterclaimed against Thompson. By letter dated October 12, 1981, Thompson tendered his resignation as secretary and director of Trawlers. However, Thompson had not been involved in the active operation of Trawlers at any time after January or early February of 1981. Personnel at the Trawlers Shipyard
Until 1980, O'Neal lived in Key West, Florida, where he operated a shrimping business. O'Neal was only present at the Trawlers shipyard for about four or five days a month. After moving to St. Augustine, Florida in early 1980, O'Neal was regularly present at the shipyard. During the years in issue, Thompson was the general manager of Trawlers. Virginia Weatherly was the bookkeeper from 1971 up to the time of the trial, and was responsible for the bookkeeping, payroll, and general accounting records for Trawlers. Ida Wheeler was sales manager and vice president of marketing from 1978 until August 1983 and was responsible for preparing contracts for boat sales. Ida Wheeler was aware that cash payments were coming into the shipyard and were not being recorded on the books and records of Trawlers. George DeAntonis was the comptroller during 1979 and 1980 and *175 was responsible for receiving and recording payments on the corporate books. Trawlers' Corporate Books and Records
Trawlers reported income from boat sales at the time the boat was completed, but reported income from sales of supplies, maintenance, and repairs at the time of sale or as the payments were received. The corporation maintained for each boat a separate folder containing the records of sales and repairs. When payments came in to Virginia Weatherly, she would first record the income on a bank deposit slip. [5] She would then record the payment in the sales journal and on the invoice. The information from the sales journal would be transferred to the customers' individual account cards. At the end of each month, Virginia Weatherly prepared summaries of the sales journal entries. A keypunch operator then transferred the summaries to the general ledgers. A public accounting firm later used these general ledgers to prepare the income tax returns for Trawlers. *176 Some of Trawlers' customers were engaged in drug smuggling and did not want the fact that they paid in cash to be recorded on the corporate books. These customers, for obvious reasons, did not want to leave a paper trail. Trawlers also wanted to avoid the reporting requirements for sums of cash exceeding $ 10,000. [6] In such cases, Trawlers would issue "dummy invoices". Instead of writing a single invoice for a large sum, Virginia Weatherly, at the direction of Thompson, would issue to fictitious persons at out-of-state addresses two or more invoices in amounts less than $ 10,000 each. To accomplish this same purpose and in a similar manner, Trawlers would also bill some supplies to fictitious out-of-state persons. Although both of these practices created false corporate records, neither practice necessarily generated any increased or unreported income for Trawlers. In a third practice whereby the corporate books were falsified (by omission), Trawlers would issue *177 a tentative or draft bill for supplies, fuel, and boat repairs, payment would be made in cash, and then the tentative or draft bill would be destroyed. These cash payments were not recorded on the corporate books. As a fourth practice, Trawlers would issue a contract (for a boat, supplies, or repairs) at less than the actual price, with the difference between the contract price and the actual price being paid in cash. These cash payments were not recorded on the corporate books. These last two practices were means by which Trawlers and the individual shareholders received unrecorded and unreported income. Beginning in 1974, Trawlers received cash payments that were not recorded on the corporate books or records. This unrecorded and unreported cash was used in two different ways. Thompson and O'Neal split most of the unrecorded and unreported cash on a 50-50 basis. On a few occasions, some of the unrecorded and unreported cash was used for corporate expenditures. Between 1977 and 1980, Trawlers purchased for cash a dozen used trucks at $ 700 each, for a total of $ 8,400. These truck purchases were not recorded on Trawlers' books, and the corporation did not depreciate the *178 trucks for Federal tax purposes. Between 1978 and 1980, Trawlers purchased for cash six paintings at $ 300 each, for a total of $ 1,800. At some point between 1976 and 1978, the corporation purchased for cash a used crane for $ 35,000. This crane purchase was not recorded on the corporate books, and the crane was not depreciated for Federal tax purposes. In 1974 or 1975, Trawlers purchased a piece of adjacent land for $ 15,000 in cash. Some of the unrecorded and unreported cash was used to pay for a few of Thompson's business trips. Safe-Deposit Box
During 1979 and 1980, Trawlers leased a safe-deposit box from Barnett Bank in St. Augustine, Florida. O'Neal and Thompson opened the box in August 1979, and they were the only persons who had access to the box. Some of the unreported cash received by Trawlers was placed in this safe-deposit box. Neither O'Neal nor Thompson kept a record of the amount of cash placed in the box. They intended to split this cash and not to report it on either their personal or the corporate tax returns. If O'Neal was at the shipyard when Thompson received cash payments, they would split the cash at that time. If O'Neal was elsewhere at *179 the time, Thompson would put the money in the safe-deposit box either that day or shortly thereafter. When O'Neal came back to St. Augustine, he and Thompson, or just Thompson, would go to the bank safe-deposit box and remove half of the money for O'Neal. O'Neal was aware that the safe-deposit box was being used to store part of the unrecorded and unreported cash. Specific Sources of Trawlers' Unrecorded and Unreported Income
1. Archie "Woody" Moore
Between June 30, 1978, and early 1981, Thompson received cash and check payments from Archie "Woody" Moore for work done by Trawlers. Some of these payments were not recorded on Trawlers' books and records. With respect to the cash payments, Moore dealt exclusively with Thompson. When he received cash from Moore, Thompson would put it in his desk drawer. Although Thompson did not specifically say he was not going to report the cash, this was understood between him and Moore. Moore was engaged in drug smuggling and did not want Trawlers to keep records of the amounts he paid in cash. [7]
*180 In 1976, Moore purchased the "Carl Moore" from Trawlers. The completion date for this boat was December 13, 1976. The total purchase price was about $150,000. Of this total, $ 30,000 was paid in cash. In 1978, Moore purchased the "Lady Lisa". The completion date for this boat was March 17, 1978. Of the total purchase price of approximately $ 230,000, $ 50,000 was paid in cash. On April 8, 1979, Trawlers completed the "Belfast Lady I". That boat was constructed in a period of 3 months, and the total purchase price was $ 300,000. Of this price, at least $ 90,000 was paid to Thompson in cash. In 1979, Moore had maintenance work done by Trawlers on two of his boats, the "Carl Moore" and the "Lady Lisa". Moore paid approximately $ 30,000-$ 35,000 in cash for the work on the "Carl Moore" and approximately $ 80,000 in cash for the work on the "Lady Lisa" throughout the year. Moore did not want, and did not get, receipts acknowledging payment for this work. About half of the $ 110,000-$ 115,000 cash payments for repairs were made in the first half of 1979, and the rest in the second half of 1979. At the beginning of 1980, Moore purchased two boats from Trawlers -- the "Lady *181 Lisa II" and the "Belfast Lady II". The completion date for the "Lady Lisa II" was February 9, 1980. The completion date for the "Belfast Lady II" was February 28, 1980. The purchase price of the "Lady Lisa II" was $ 235,000, of which $ 50,000 was paid in cash to Thompson. Approximately $ 90,000 of the "Belfast Lady II" purchase price was paid in cash to Thompson. For its fiscal years 1979 and 1980, Trawlers recorded and reported only the following cash payments from Moore: Date
Amount
12/08/78
$ 2,000.00 01/17/79
37,960.00
04/10/79
15,225.00
08/16/79
508.80
$ 55,693.80
Sometime late in 1980 or early 1981, Moore received a telephone call from Ida Wheeler telling him that he should come to the Trawlers shipyard to see Thompson. When Moore got there, he met with Wheeler and Thompson, who talked about destroying some records. Moore was not told that Trawlers was under investigation and assumed initially that whatever problems there were pertained to his own personal income taxes. Moore apparently was under investigation by a Federal grand jury around this same time. Ida Wheeler had a folder with Moore's boat contracts and other records in it. Wheeler *182 and Thompson questioned Moore about the amount of cash, if any, he had reported on his tax returns and then removed and destroyed some of the records from the folder. During a taped conversation between Thompson and O'Neal on July 21, 1982, O'Neal told Thompson that he had testified before the grand jury that all of the cash payments had been recorded on the corporate books, and then the following colloquy occurred: Thompson: How can [the grand jury], how can they trace that that cash that we took? How can they trace that? O'Neal: I I don't think there's anybody out there that ah, I don't know that they can. (Pause) But they're aware of some things going on from the people we've dealt with. Thompson: Uh uh. O'Neal: Such as namely Woody Moore. They . . . Thompson: Right. Has (O'Neal inaudible) has Woody Moore said that he gave us cash? O'Neal: I have no idea. Don't think he has because he's just like we we are -- he's got to hide it if he can. I don't think he has. * * *
The O'Neals did not report any of the unrecorded cash payments on their Federal income tax returns for 1979 and 1980. Trawlers did not report any of the unrecorded cash payments on its *183 Federal income tax returns for its fiscal years ended June 30, 1979, and June 30, 1980. 2. Ken Kiken
Between June 30, 1978, and early 1981, Thompson received cash and check payments from Ken Kiken for maintenance work performed by Trawlers and for supplies and boats purchased from Trawlers. Kiken was engaged in drug smuggling throughout this period. Kiken first had business dealings with Trawlers around 1978 or 1979 and dealt primarily with Thompson. Kiken usually did not get a receipt from Thompson, nor did Kiken want one. He would give Thompson the cash in Thompson's office, and Thompson would put the money in his desk drawer. O'Neal was aware that Kiken paid some of his accounts in cash, but only Thompson and Ida Wheeler physically received the cash from Kiken. In 1981, after Thompson had left Trawlers and Kiken was dealing with O'Neal and Virginia Weatherly, Kiken was given receipts. Kiken's business dealings with Trawlers ceased in 1983. Trawlers built the "Elizabeth Ann", a fiberglass trawler, for Kiken in 1980. The completion date for this boat was June 8, 1980. The purchase price was approximately $ 330,000-$ 350,000. In addition to the purchase price, Kiken *184 paid $ 75,000 in cash for extras on the boat. Trawlers also built the "Patricia Ann" (a.k.a. "The Capricorn"), another fiberglass trawler, for Kiken. The completion date of the "Patricia Ann" was November 3, 1981. The purchase price of this boat was about $ 350,000-$ 360,000. Kiken paid an extra $ 30,000 to $ 50,000 in cash at the time this boat was completed. Kiken bought the "Miss Suzanne" (a.k.a. "Coral Ray"), a used boat, from O'Neal in late 1979. Kiken paid $ 178,000 for the boat. O'Neal personally financed the purchase price for Kiken over a period of 5 years. O'Neal reported this amount on his tax returns. Kiken also paid $ 100,000 in cash for extras on the boat. Kiken owned a wooden boat called the "Freddie J" (a.k.a. "Miss Victoria"). Kiken had about $ 200,000 worth of work done on the "Freddie J" throughout 1979. He paid approximately $ 30,000 of the cost by check and the remaining $ 170,000 was paid in cash throughout the year. Each year, Kiken left his boats at Trawlers for about 6 to 8 weeks for maintenance work. In 1979, Kiken paid about $ 200,000 in cash for maintenance work on his boats. In 1980, he paid a minimum of $ 200,000 in cash for maintenance. *185 And in 1981, he paid approximately $ 350,000 in cash for such maintenance. About 95 percent of the cost of the boat supplies that Kiken purchased from Trawlers was paid in cash. In addition to the extras on the boats mentioned above, the supplies for the boats included fuel. The cost was about $ 10,000 per boat each time the boats were refueled. Kiken always paid cash for fuel. It is unclear how many times per year each boat was refueled, although it is clear that each boat was refueled at least one time per year. Between 1979 and 1981, Trawlers recorded on its corporate books the following cash payments received from Kiken: Date
Amount
08/21/79
$ 2,000.00
04/04/80
37.50
10/06/80
621.16
01/08/81
414.69
02/13/81
133.06
05/07/81
15,000.00
11/06/81
5,200.00
11/09/81
4,600.00
$ 28,006.41
The O'Neals did not report any of the unrecorded cash payments on their Federal income tax returns for 1979 and 1980. Trawlers did not report any of these amounts of unrecorded cash on its corporate tax returns for its fiscal years ended June 30, 1979, and June 30, 1980. 3. Gene Culmer
Between 1977 and 1980, Trawlers received $ 100,000 in unrecorded and unreported *186 cash payments from Gene Culmer. In 1979 and 1980, Trawlers listed on its books and records a total of only $ 26,533 in cash payments received from Culmer: [8]
Date
Amount
01/31/79
$ 2,000 01/31/79
2,000
02/12/80
22,533
$ 26,533
The unrecorded amount of cash was split between Thompson and O'Neal. None of the unrecorded amount of cash was reported on the Federal income tax returns of the O'Neals for 1979 and 1980 or on the corporate returns of Trawlers for its fiscal years ended June 30, 1979, and June 30, 1980. 4. William "Billy" Wells
In 1979, William "Billy" Wells and O'Neal became equal owners of the Seaford Scallop Company, Inc., a scallop and fishing business located in Seaford, Virginia. When doing business with Trawlers, Wells dealt primarily with O'Neal. Between July 1978 and June 1982, Trawlers reported receiving from Wells almost $ 2.5 million in checks, but no cash. Between 1977 and 1980, however, *187 Trawlers also received $ 200,000 in cash from Wells. This amount was not recorded on the corporate books and was split between Thompson and O'Neal. The O'Neals did not report any of this cash on their individual Federal tax returns. Trawlers did not report any of this cash on its corporate income tax returns. 5. Scrap Metal Sales
Between August 1979 and December 1980, Trawlers received a total of $ 21,000 in cash from the sale of scrap metal. None of this amount was recorded on the corporate books. Thompson and O'Neal split this money equally. Neither the O'Neals nor Trawlers reported any of this cash on their Federal income tax returns. O'Neal was aware that Trawlers was selling scrap metal, and that he and Thompson were splitting the proceeds from such sales. 6. Hemmingway Transaction
In late 1980, Jack Hemmingway paid $ 90,000 in cash towards a new boat he purchased from Trawlers. Ida Wheeler received the cash and turned it over to O'Neal. Around January 7, 1981, O'Neal gave $ 61,000 of this cash to Smeaton; O'Neal and Thompson split the remaining $ 29,000. None of the $ 90,000 was reported on Trawlers' corporate tax return for its fiscal year ended June *188 30, 1981. The O'Neals did not report any of this cash on their personal income tax returns for 1980 or 1981. 7. Vending Machines
There were vending machines at Trawlers shipyard from 1972 to 1980. Thompson got the payments from the vending machines, which totaled about $ 20,000. None of the vending machine income was recorded on Trawlers' books. Thompson did not give any of the vending machine money to O'Neal or Trawlers. O'Neal knew that Thompson was receiving this money. Neither the O'Neals nor Trawlers reported vending machine income on their Federal income tax returns for the years at issue (i.e., 1979 and 1980 for the O'Neals and fiscal years ending June 30, 1979, and June 30, 1980, for Trawlers). 8. $ 35,550
In 1980, O'Neal received $ 35,550 in cash from Thompson. O'Neal got the first part of this money from Thompson around May or June 1980. The money was paid in four or five installments. This cash came from the sale of supplies, scrap metal, and surplus equipment and not from boat sales or repairs. O'Neal kept this cash in a bank bag in the trunk of his car. He did not report it on his Federal income tax return for 1980 even though he knew and believed *189 that he could have spent the money anytime he wanted to. [9] O'Neal understood that he had a duty to file an accurate return. In July of 1982, O'Neal filed an amended return for 1980 and, again, did not report this income. Around June of 1981, O'Neal gave the bank bag to Virginia Weatherly and told her to put it in the file cabinet in her office for safekeeping. On June 13, 1983, 3 days after O'Neal's sentencing hearing on his conviction for perjury, Virginia Weatherly deposited the cash into Trawlers' bank account. On July 11, 1983, Trawlers filed an amended corporate tax return (Form 1120X) for its fiscal year ended June 30, 1981, reporting $ 35,550 of additional income. On that amended corporate return, below the statement of income not previously reported, was the following statement: "Note: *190 There may be additional income to be reported at a later date." George DeAntonis prepared and signed this amended return. Virginia Weatherly testified at the trial of this case that she did not know how much money was in the bank bag until she deposited it. However, at O'Neal's sentencing hearing on June 10, 1983, 3 days before she deposited the money, she testified that approximately $ 35,000 was in the bag. O'Neal testified at the trial in the present case that he did not tell the grand jury about this money because he had forgotten about it. [10]
9. Use of Automobiles
During 1979 and 1980, O'Neal used cars owned *191 by Trawlers for both business and personal use. He did not report the personal use of the car as constructive dividends on his Federal income tax return for either year. Double Contracts
Between 1974 and 1981, Trawlers prepared at least 40 double contracts for boat sales or boat repairs. The two contracts for the same transaction would contain different prices. The contract with the lower price reflected the actual contract price for the boat or boat repairs. The contract with the higher price was a phony contract that Trawlers furnished to its customer so that the customer could obtain financing for 100 percent, or more, of the actual purchase price. To the extent that the amount received from the lending institution exceeded the actual contract price, Trawlers would dispose of the excess funds in one of three ways: (1) transfer the balance to a supply account for the customer; (2) transfer the balance to another boat or boats of the same customer; or (3) issue credit memos to the customer. O'Neal knew of the double-contract practice, at least with respect to customer Marion Duzich. The double-contract transactions generally did not generate any unreported income for *192 Trawlers but constituted a fraud upon the bank or other lending institution financing the transaction. O'Connell/HUD Transaction
John O'Connell was the president of O'Connell Seafood in Boston, Massachusetts. James Norton was his corporate attorney. In 1980, O'Connell Seafood applied for and received a $ 2.1 million grant from the United States Department of Housing and Urban Development (HUD) to build a fishing facility in Boston Harbor. This facility included a floating dry dock to be built by and purchased from Trawlers. O'Connell and Norton gave HUD a phony sales contract for the dry dock, the "Eleanor Eileen XIV", that showed a sales price of $ 890,000. Ida Wheeler executed that phony contract on behalf of Trawlers. The actual contract price of the "Eleanor Eileen XIV" was only $ 425,000. O'Connell and Norton were ultimately convicted of conspiracy to defraud HUD; making false material declarations before the grand jury; influencing, obstructing and impeding the due process of justice; and obstructing a witness, in violation of 18 U.S.C. sections 371, 1503, 1623, and 2. Trawlers received payments from the bank and/or HUD relating to the "Eleanor Eileen XIV" in excess *193 of $ 425,000. The invoices showing payments from O'Connell Seafood to Trawlers were "dummy" invoices, evidenced by the fact that they did not have stamped invoice numbers on them. They were unrelated to and not part of the corporation's regular books and records and had no corporate purpose. These "dummy" invoices were prepared at the direction of Thompson. Trawlers issued four checks to O'Connell Seafood in the total amount of $ 200,000. Trawlers falsely characterized these payments as "sales commissions". The checks represented amounts received from the financing bank or HUD that exceeded Trawlers' actual contract price. In this manner the excess funds were channeled to O'Connell Seafood in the guise of "sales commissions". On December 30, 1980, a letter containing the following statement was presented to John Marcus Thompson, Trawlers' financial manager, for his signature: 1. Upon receipt of $ 123,200.00 the outstanding balance due on a total contract price of $ 890,000.00, St. Augustine Trawlers Inc. will release same to O'Connell Seafood Co., Inc. the Dry Dock Eleanor Eileen XIV, free of any liens.
He refused to sign this false statement. At the bottom of *194 this letter, John Marcus Thompson wrote and signed the following: This document was given to me by John O'Connel [sic] & Jim Norton at a meeting on December 30, 1980. I refused to have this executed because of the statement in #1.
O'Neal later signed a builder's affidavit indicating that the contract price had been paid and that the dry dock was free of any liens, but his affidavit was silent as to the total contract price or as to the total amount actually paid to Trawlers. This double-contract scheme did not generate any income for Trawlers. Indictments
In November 1981, during the criminal investigation arising out of the O'Connell/HUD transactions, Thompson agreed to be a cooperating witness for the United States and secretly record conversations with O'Neal. On October 12, 1982, Thompson was charged with conspiracy to defraud the United States, specifically HUD, in connection with the O'Connell dry dock transaction, in violation of 18 U.S.C. section 371. On October 14, 1982, pursuant to the understanding reached in November 1981, Thompson signed a plea agreement with the United States. Between January 18, 1982, and July 21, 1982, at the request of the FBI, *195 Thompson taped several conversations between himself and O'Neal. On January 19, 1982, the following conversation took place: Thompson: Is there, is there any records on ah amount of cash that we took in? O'Neal: No, I don't think there's anything. The only thing ah, only thing there, Jerry, is some whole lot ah, I'm not so sure that I really got my part of some of that money. Ah, in fact I'm I'm sure I didn't. Because ah it's a lot, it's a lot of ah repair jobs been done here and ain't no records nowhere and I know that I didn't get that money. * * * O'Neal: And you know it. Thompson: Ah some of it yes, I'm I know you didn't get it all, but ah you you got a lot of it. (Laughs). * * * O'Neal: And you know, you know that, I ah ah that's not saying nothing about the the cash money and the other things that was happening. Now the cash money we split ah, I don't think it that that's gonna come up, it hasn't been mentioned and I, and I'm not gonna mention it. Cause that's, that's dangerous, too. Thompson: Yeah, it damn sure is, O'Neal: That's dangerous. Thompson: that, that's one thing bothers me the the ah the cash that we took in and O'Neal: Well *196 now Thompson: ah out. . . O'Neal: I don't, I don't really think that's gonna come up. That hadn't been mentioned and I'm sure as hell not gonna mention anything and shouldn't be mentioned. Thompson: No. O'Neal: Because ah that's dangerous as hell and ah ah not only is it taxable, that that is dam, that is penitentiary. Thompson: Right. O'Neal: That's pure old income tax evasion.
And on March 18, 1982, the following conversation took place: O'Neal: But ah the thing that's getting serious now is cash money. (Pause) Internal Revenue's gettin' in on it. Internal Revenue's coming back. . . . Thompson: Well. . . O'Neal: Monday. Thompson: you just talking about ah Woody Moore, ah. . . O'Neal: (Inaudible) no, not necessarily Woody Moore. They said that a lot of cash has come in here so I said, no, no, ain't no lotta cash. The only cash I know that's come in here has been recorded and put in the bank and our bank records show it. Thompson: Uh uh. O'Neal: Ain't no way that I'd tell 'em that ah about these other things because, * * * it'd (pause) that's, that's real dangerous. Thompson: Sure would. O'Neal: But I don't know where they *197 got the information than ah only out of these records. Thompson: Well, Woody. . . . O'Neal: Thought that was taken care of. Thompson: Woody didn't have any records to show that he paid cash, did he? O'Neal: Not that I know of. Thompson: Unless he made some records of his own.
On May 27, 1982, O'Neal testified before a Federal grand jury in the Middle District of Florida. During the proceedings before the grand jury, O'Neal testified to the following: Q: To your knowledge, you have not been involved in any way to evade income tax by obtaining cash payments under the table? A: No, sir.
This testimony formed the basis for the indictment handed down against O'Neal on October 14, 1982. That indictment charged O'Neal with knowingly making false statements to the grand jury, in violation of 18 U.S.C. section 1623. On March 18, 1983, O'Neal pled guilty to this charge. On June 10, 1983, O'Neal was given a 5-year suspended sentence, placed on 5 years' probation, fined $ 10,000, and ordered to contribute 4 hours a week of community service. ULTIMATE FINDINGS OF FACT 1. Velton J. O'Neal and Jerry D. Thompson acted in concert between 1977 and 1981 in splitting *198 unrecorded and unreported cash income of their corporation, Trawlers. 2. In 1979, the O'Neals had unreported income of at least $ 329,391.35. 3. In 1980, the O'Neals had unreported income of at least $ 293,965.97. 4. The O'Neals underpaid their Federal income tax in 1979 and 1980, and all or a substantial part of the underpayment each year was due to fraud on the part of Velton J. O'Neal. 5. For the taxable year ended June 30, 1979, Trawlers had unreported income of at least $ 365,337.28. 6. For the taxable year ended June 30, 1980, Trawlers had unreported income of at least $ 748,031.28. 7. Trawlers underpaid its Federal income tax for its fiscal years ended June 30, 1979, and June 30, 1980, and all or a substantial part of the underpayment each year was due to fraud. OPINION This is a fraud case with the normal split burden of proof. The taxpayers must prove by a preponderance of the evidence any errors in the deficiency determinations, except that respondent has the burden with respect to any increases in deficiency pleaded in the answers and amendments to answers. Rule 142(a). Respondent must prove by clear and convincing evidence the elements of fraud. Sec. *199 7454(a); Rule 142(b); Henson v. Commissioner, 887 F.2d 1520, 1525 (11th Cir. 1989), affg. T.C. Memo. 1988-275; Zack v. Commissioner, 692 F.2d 28, 29 (6th Cir. 1982), affg. T.C. Memo. 1981-700. At the outset, we note that resolution of the issues involves a credibility determination as between Thompson and petitioner O'Neal. We do not find Thompson's testimony wholly credible, especially with respect to the amount of unreported cash he split with O'Neal. [11] However, we find petitioner O'Neal's testimony to be utterly unworthy of belief. O'Neal's trial testimony was controverted by virtually every credible witness as well as by O'Neal's own taped conversations with Thompson. O'Neal, moreover, is a convicted perjurer and his conviction stemmed from his denial of receiving cash payments under the table. We are not required to accept the unpersuasive, self-serving testimony of petitioner O'Neal. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). *200 During trial, after extensive stipulations, all of the nonfraud issues were resolved. Respondent had the burden of proof on all issues remaining in this case, i.e., the fraud issues and the increased deficiency amounts. Petitioners contend that respondent has not met her burden as to the deficiencies. We find, however, that the evidence of substantial amounts of unreported income is overwhelming. The amounts of unreported cash income of Trawlers and of the O'Neals are tabulated in Appendices I and II to this opinion. Both "Woody" Moore and Ken Kiken testified as to the amounts of cash paid to Trawlers, the particular transactions to which the cash related, and the years in which the cash was paid. Although both of these men are convicted drug smugglers, we found their testimony in this Court to be candid and truthful. The fact that unreported cash was received from both Moore and Kiken was corroborated by Thompson both at trial and during interviews with FBI agents. Moreover, O'Neal's own taped conversations compel the finding that he and Thompson were receiving substantial amounts of unreported income. See supra note 10. Bruce Hoover, an independent certified public *201 accountant and disinterested third party, testified that the following transpired at a meeting with O'Neal on March 5, 1981: So, I said [to O'Neal], Well, just suppose a fisherman wanted to buy a boat for $ 275,000, and he had $ 50,000 worth of cash he wanted to launder, so you give him an invoice for two and a quarter, and somebody in the yard takes $ 50,000, be it some employee or an officer of the yard. What about that sort of situation? And he said, Oh, yes. We [he and Thompson] did that.
On January 19, 1982, in a secretly taped conversation with Thompson, O'Neal made the following statements: Thompson: Is there, is there any records on ah amount of cash that we took in? O'Neal: No, I don't think there's anything. The only thing ah, only thing there, Jerry, is some whole lot ah, I'm not so sure that I really got my part of some of that money. Ah, in fact I'm I'm sure I didn't. Because ah it's a lot, it's a lot of ah repair jobs been done here and ain't no records nowhere and I know that I didn't get that money. Thompson: Ahm, (Inaudible voices in background) O'Neal: And you know it. Thompson: Ah some of it yes, I'm I know you didn't get it all, *202 but ah you you got a lot of it. (Laughs) O'Neal: Maybe I got a lot of it, but a lot and what's what you entitled to Thompson: Yeah. O'Neal: is two different things.
Kiken testified that he got receipts for his cash dealings with Trawlers only after Thompson had left Trawlers. In one conversation with Thompson, on July 21, 1982, O'Neal explained why Kiken's cash dealings took on an air of legitimacy at this time. O'Neal stated: "Ken's done some cash business, quite a bit of cash business since since we've taken it back over but ah, but we we put it in the bank. Course we had to cause we need it." In that same conversation, O'Neal stated he knew that some of the cash coming into Trawlers was being diverted from the corporate books: O'Neal: I've been keeping [Ida Wheeler] and paying her this damn big price she's collecting until this damn thing's over. She's costing us a fortune. Well, you know what her salary was. Thompson: Yeah. O'Neal: And she's the only one we didn't raise last year, and ah ah (pause), but I been keeping her mainly for that reason because I don't wanna antagonize her, get her mad, because she can be vindictive you know and I says, all *203 you can do, Ida, is say is ah if any of the customers did pay you, you just you just turned it in to ah ah the accounts receivable and that, what happened to it then you don't know. Thompson: But she's too smart for that. O'Neal: Yeah, she's, yeah, she's too smart, she knows that it went to some other place. Thompson: Yeah. She's, she's gonna, I betcha (O'Neal inaudible) when they do call her, she's gonna go up there and tell 'em that Woody Moore paid thirty thousand or whatever and I give it to Jerry or I give it to Virginia and I give it to Puck [O'Neal] and they (O'Neal in background - inaudible) went and put it in a box and. . . . O'Neal: I told her when she went up there before. . . . Thompson: that's what she's gonna say. I guarantee ya.
Petitioner Trawlers
Trawlers' arguments are based on the assumption that Thompson was acting without the knowledge and acquiescence of O'Neal. The facts are otherwise. Because we reject this assumption, we need not further address Trawlers' contentions. "Diverted amounts taxed to a shareholder as constructive dividends also remain fully taxable to the corporation to which attributable." Truesdell v. Commissioner, 89 T.C. 1280, 1300 (1987). *204 The full amount of the unreported cash receipts is income to Trawlers. The O'Neals
The O'Neals contend that the only money Velton J. O'Neal received was the $ 35,550 cash purportedly from the sale of scrap metal or used equipment. The record shows otherwise. The O'Neals' first argument is that none of the money (the $ 35,550) should be taxable because the funds were segregated and were never actually used for personal benefit. In support of this argument, petitioners direct us to two memorandum opinions of this Court. In Rosencrans v. Commissioner, a Memorandum Opinion of this Court dated Feb. 26, 1954, the taxpayer withdrew funds from his wholly owned corporation and placed the money in his safe-deposit box. The money was held for safekeeping until the taxpayer could locate a piece of property for the corporation to purchase. This Court held that those funds were neither a loan nor a dividend to that taxpayer and that he derived no benefit from holding the funds in his safe-deposit box. There was no indication in Rosencrans, as there is in the instant case, that the corporation omitted the money from its books and from its tax returns. On this point, the *205 O'Neals direct us to Hammer v. Commissioner, T.C. Memo. 1989-396, in which the unreported income of the corporation was deposited by the two shareholders into a brokerage account. The diversion of funds took place over the course of 3 years. The funds and the earnings thereon were returned to the corporation a year later. The Court found that the facts of that case were akin to the facts in Rosencrans, that those shareholders did not realize income because they derived no personal benefit from the diverted funds. Moreover, the corporation in Hammer filed amended returns, reported the omitted income, and paid additions to tax for fraud under section 6653(b). Here Trawlers never received the vast majority of the unrecorded and unreported cash, only this $ 35,550 that played so prominently in O'Neal's change of plea and sentencing for perjury. Here, Thompson and O'Neal derived substantial benefits since they kept the bulk of the cash they split. The present case is wholly distinguishable on its facts from the Memorandum Opinions petitioners rely on. We hold that O'Neal did realize the $ 35,550 as income in 1980. We follow the reasoning of the Supreme *206 Court in Corliss v. Bowers, 281 U.S. 376, 378 (1930), that "the income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." (Emphasis supplied.) [Gain] constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells, 289 U.S. 670, 678; [53 S.Ct. 761, 764, 77 L.Ed. 1439;]Corliss v. Bowers, 281 U.S. 376, 378. [50 S.Ct. 336, 337, 74 L.Ed. 916.]That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it.
Rutkin v. United States, 343 U.S. 130, 137 (1952). See also North American Oil Consolidated v. Burnet, 286 U.S. 417, 424 (1932), wherein the Supreme Court stated: If a taxpayer receives *207 earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.
O'Neal had no intention to return the money to the corporation at the time he received it from Thompson. See Kaplan v. Commissioner, 43 T.C. 580, 592-593 (1965). O'Neal kept the $ 35,550 in the trunk of his car for a year before giving it to Virginia Weatherly. He testified that he could have spent the money anytime he wanted. See supra note 9. It is noteworthy that the money was not deposited in the corporate bank account until 3 days after O'Neal's sentencing hearing. O'Neal did not hold the money for any corporate purpose. [12] We hold that the $ 35,550 was income to the O'Neals in 1980.
The O'Neals' second argument is that *208 a portion of the $ 35,550 may contain some of the money from the Hemmingway transaction, which the O'Neals contend was received in early 1981. Therefore, they argue that only a portion of the $ 35,550 is taxable in 1980. For several reasons, we find this argument to be meritless. We have found as a fact that the Hemmingway money was received by O'Neal in late 1980, not in early 1981. Further, there is no persuasive evidence that any part of the $ 35,550 money received from Hemmingway. The $ 35,550 was received from the sale of scrap metal and used equipment. The Hemmingway money was received as a $ 90,000 down payment on the purchase of a boat. The O'Neals' third argument is that if O'Neal received any money in 1980, it was no more than $ 35,550, which he now "readily admits" he received throughout the latter part of 1980. For the reasons noted above in our discussion of the evidence of record, we find this argument wholly without merit. O'Neal received this $ 35,550 plus other substantial amounts of unreported cash income in 1980. The O'Neals received one-half of Trawlers' unreported income that was not used for corporate expenditures. "Funds (or other property) distributed *209 by a corporation to its shareholders over which the shareholders have dominion and control are to be taxed under the provisions of section 301(c)." Truesdell v. Commissioner, 89 T.C. at 1298. Although neither party has addressed the amount of Trawlers' earnings and profits account, we will make a few observations as pertains to the constructive dividends issue. This case is appealable to the United States Court of Appeals for the Eleventh Circuit, and thus we will follow a decision of that court that is directly on point. Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). The Eleventh Circuit's decision in United States v. Williams, 875 F.2d 846 (11th Cir. 1989), however, is distinguishable. In that case, the court held that, in criminal tax cases, the Government need not characterize diverted income and, therefore, does not have to present evidence as to earnings and profits. United States v. Williams, supra at 852, 850. Because that court's holding specifically applies only to criminal tax *210 cases, it is not within the ambit of the Golsen rule. Thus, we will follow our opinion in Truesdell v. Commissioner, supra.
Pursuant to section 301(c), the amount of unreported cash that is a constructive dividend to the O'Neals would be limited, first, to Trawlers' current earnings and profits and, second, to its accumulated earnings and profits. Any excess amount of the constructive distribution would reduce, but not below zero, O'Neal's basis in Trawlers. Any further excess would be treated as capital gain. In determining the amount of corporate earnings available for a dividend, the amount of unreported income is added into the corporation's earnings and profits. Bernstein v. United States, 234 F.2d 475, 481-482 (5th Cir. 1956). While the amount of earnings and profits is then reduced by the corporate tax liability, it is not further reduced by any fraud addition: It is not consistent with our ideas of proper accounting practice for officers and directors of a corporation to be permitted to conduct the affairs of their corporation in such a way as to defraud the government and then assert the existence of a fraud penalty *211 as a corporate liability, and thus translate what would otherwise be a dividend distribution to themselves into a distribution of capital.
Bernstein v. United States, supra at 482. We do note, however, for the sake of completeness, that some small portion of the unreported receipts is not to be treated as constructive distributions to O'Neal. In Herman v. Commissioner, 84 T.C. 120, 134-135 (1985), we found that if there is a substantial corporate purpose for an expenditure, it is not a dividend to the shareholder. There is "no constructive dividend so long as * * * [the taxpayer] can show that his intent 'was to use such funds for corporate purposes as an agent of the corporation.'" Stone v. Commissioner, 865 F.2d 342, 343 (D.C. Cir. 1989), revg. Rosenbaum v. Commissioner, T.C. Memo. 1983-113 (citing Nasser v. United States, 257 F. Supp. 443, 449 (N.D. Cal. 1966)). The unreported income that was used for corporate expenses is not available for dividend treatment. However, the amounts paid for trucks and paintings in the taxable years at issue have been excluded from the *212 amounts of unreported income in the ultimate findings of fact. [13] See Appendices I and II. Sec. 6653(b) Additions
Respondent has the burden of proving by clear and convincing evidence the elements of fraud for the section 6653(b) additions to tax. Sec. 7454; Rule 142(b); Henson v. Commissioner, supra; Zack v. Commissioner, supra. The two elements are (1) the existence of an underpayment of tax each year and (2) that some part of that underpayment of tax each year was due to fraud. Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax *213 believed to be owing. Candela v. United States, 635 F.2d 1272, 1275 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, supra; Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Acker v. Commissioner, 26 T.C. 107, 112 (1956), affd. in part, revd. in part 258 F.2d 568 (6th Cir. 1958), affd. 361 U.S. 87 (1959). Fraud will never be presumed. Beaver v. Commissioner, supra.
Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964), cert. denied 389 U.S. 912 (1967). Fraud, however, can seldom be proved by direct proof of the taxpayer's intention. Therefore, fraud *214 must be determined from the taxpayer's entire course of conduct and can, and usually must, be proved by circumstantial evidence. Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). This and other courts frequently list various factors or "badges of fraud", but such lists of various kinds of circumstantial evidence from which fraudulent intent can be inferred are nonexclusive. Bradford v. Commissioner, supra; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988). The fact finder must weigh all of the evidence in the record. While not a checklist, some of the factors this Court has considered as indicative of fraud are: (1) an understatement of income; (2) inadequate records; (3) implausible or inconsistent explanations of behavior; (4) concealment of assets; (5) failure to cooperate with tax authorities; (6) engaging in illegal activities; and (7) *215 dealing in cash. Meier v. Commissioner, 91 T.C. at 297-298 (citing Bradford v. Commissioner, 796 F.2d at 307-308). In this case, one of the taxpayers, Trawlers, is a corporation and the requisite fraudulent intent must be found in the acts of its officers and shareholders. Loftin and Woodard, Inc. v. United States, 577 F.2d 1206, 1244 (5th Cir. 1978); American Lithofold Corp. v. Commissioner, 55 T.C. 904, 925-926 (1971); Benes v. Commissioner, 42 T.C. 358, 382 (1964), [14] affd. without opinion 355 F.2d 929 (6th Cir. 1966), cert. denied 384 U.S. 961 (1966); Ace Tool & Eng., Inc. v. Commissioner, 22 T.C. 833, 843 (1954). It is proper to attribute to the corporation the fraudulent acts of the majority shareholder when those acts are "in substantial part for the tax benefit of, and intended to be for the tax benefit of, * * * [the corporation]." Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 507 (10th Cir. 1973), affg. in part, remanding in part T.C. Memo. 1971-194. *216 Looking at the entire record, we find both petitioner O'Neal and petitioner Trawlers liable for the additions to tax for fraud. The record is replete with evidence of intent to conceal income and evade the payment of tax. "Once a taxpayer has taken control of funds diverted from a corporation and then fails to report such funds as income or to make any adjustment in the corporate books to reflect a return of capital, that is sufficient to imply willful intent to evade taxes." United States v. Thetford, 676 F.2d 170, 175 (5th Cir. 1982), cert. denied 459 U.S. 1148 (1983). Aside from circumstantial evidence, there is evidence of fraudulent intent from O'Neal's own mouth in conversations with Thompson. On January 19, 1982, in a secretly taped conversation with Thompson, O'Neal stated as follows: O'Neal: And you know, you know that, I ah ah that's not saying nothing about the the cash money and the other things that was happening. Now the cash money we split an, I don't think it that that's gonna come up, it hasn't been mentioned and I, and I'm not gonna mention it. Cause that's, that's dangerous, too. Thompson: Yeah, it damn sure is, *217 O'Neal: That's dangerous Thompson: that, that's one thing bothers me the the ah the cash that we took in and O'Neal: Well now Thompson: ah out . . . O'Neal: I don't, I don't really think that's gonna come up. That hadn't been mentioned and I'm sure as hell not gonna mention anything and shouldn't be mentioned. Thompson: No. O'Neal: Because ah that's dangerous as hell and ah ah not only is it taxable, that that is dam, that is penitentiary. Thompson: Right. O'Neal: That's, that's pure old income tax evasion.
On March 18, 1982, the following conversation took place: O'Neal: IRS is coming in here, ah, IRS is coming in here Monday, done called me and told me and ah they did a routine audit but now they they got all this information of so much cash, and I'm just gonna tell 'em that (inaudible) only cash coming in here is is going in the bank and and I really don't know that they'll find too much of that, of the cash (inaudible) The only thing that I. . . . Thompson: They shouldn't be able to find any. O'Neal: Only thing that I've considered bringing out or revealing would be the sixty-one thousand dollars we gave Smeaton (pause) ah to show where *218 some of that cash went. Thompson: But . . . O'Neal: We gave him sixty-one thousand. Thompson: how how can you prove that you gave him the sixty-one and we didn't keep it? O'Neal: Because I've got, I've got a letter. I've got a letter from Luedke to him and it's involved in it.
This refusal to cooperate with respondent and the statements of O'Neal indicating his intent to conceal sources of cash are indicative of fraud. Stringer v. Commissioner, 84 T.C. 693, 715 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986). In another taped conversation with Thompson on July 21, 1982, O'Neal discussed his prior testimony before a grand jury. That testimony was designed to conceal the receipt of cash payments on behalf of the corporation. O'Neal: * * * And ah (pause) course they catch ya lying they'll put your ass in jail for perjury and then. . . . Thompson: Yeah. O'Neal: then you've had it. I just wanted to make you aware if you're called that's, that was my answer, and I told him, I said no sir, the only thing that ah eh that we have done some cash business and it's all been recorded.
During a later *219 part of the same conversation, it becomes even more apparent that O'Neal was concealing the unreported cash. Thompson: That that kinda scares me about that Grand Jury -- they checking on the cash. O'Neal: Well. . . . Thompson: Son of a bitch. O'Neal: that that's the main reason I wanted to tell ya so you can be aware. Thompson: How can they, how can they trace that that cash that we took? How can they trace that? O'Neal: I I don't think there's anybody out there that ah, I don't know that they can. (Pause) But they're aware of some things going on from the people we've dealt with . . . Thompson: Uh uh. O'Neal: Such as namely Woody Moore. They . . . Thompson: Right. Has (O'Neal inaudible) has Woody Moore said that he gave us cash? O'Neal: I have no idea. Don't think he has because he's just like we are -- he's got to hide it if he can. I don't think he has. * * *
In late 1980 or early 1981, Ida Wheeler and Jerry Thompson destroyed the records of Woody Moore's cash dealings with Trawlers. Thompson and O'Neal were acting together to conceal income for their own benefit as well as for the benefit of the corporation. Moreover, O'Neal's knowledge *220 of the destruction of Moore's records is apparent from the following conversation concerning respondent's investigation of unreported cash: O'Neal: But I don't know where they got the information than ah only out of these records. Thompson: Well, Woody . . . O'Neal: Thought that was taken care of. The willful and intentional destruction of business records designed to conceal income is evidence of fraud. Spies v. United States, 317 U.S. 492, 499 (1943); Stringer v. Commissioner, 84 T.C. at 715. Moreover, Trawlers' records were consistently altered and falsified for both tax and nontax reasons. The failure to keep complete and accurate records of income is further evidence of fraud. Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). "Consistent and substantial understatement of income is evidence of fraud, as are inadequate or nonexistent records." Wilson v. Commissioner, 76 T.C. 623, 633 (1981). A substantial understatement of income over the course of several years exists with respect to both the corporate and the individual petitioners in this case. Between 1976 and 1981, Trawlers *221 failed to report well over $ 1.7 million in cash receipts. O'Neal received a sizable portion of this money, yet failed to report any of it as income. We find that respondent has carried her burden and thus sustain the section 6653(b) additions to tax for fraud for both Trawlers and O'Neal for the pertinent taxable years. To reflect the above holdings and concessions by the parties, Decisions will be entered under Rule 155. APPENDIX I Trawlers' Unreported Cash Income
FYE 6/30/79
1.
Archie "Woody" Moore
Cash Received
1979-"Belfast Lady I" $ 90,000.00 1979: $ 110,000/2 Maintenance on "Carl   Moore" and "Lady Lisa"   55,000.00
$ 145,000.00
Amts. reported by Trawlers
12/08/78
$ 2,000.00  1/17/79 37,960.00
4/10/79 15,225.00
$ 55,185.00 Total Unreported Cash:
$ 89,815.00 2.
Ken Kiken
Cash Received
1979: $ 170,000/2--work on "Freddie J"   $ 85,000.00 1979 (maintenance) 200,000/6 months   100,000.00
fuel (2 boats--1979) 20,000.00
$ 205,000.00
Amts. reported by Trawlers
0
Total Unreported Cash:
$ 205,000.00
3.
Gene Culmer
Cash Received
$ 100,000/4 yrs.   $ 25,000.00 Cash reported by Trawlers
1/31/79 $ 2,000.00  1/31/79 2,000.00
$ 4,000.00  Total Unreported Cash:
$ 21,000.00 4.
William "Billy" Wells
Cash Received
$ 200,000/4 years $ 50,000.00 Cash Reported
0     Total Unreported Cash:
$ 50,000.00 5.
Vending Machines
Cash Received
$ 20,000/108 months   $ 185.19/mo x 12   $ 2,222.28  Total Unreported Cash:     $ 368,037.28
(Corporate Expenditures)
1.12 trucks/4 years @ $ 700 per truck   ($ 2,100.00)  2.6 paintings/3 years @ $ 300 per painting   (600.00)    Unreported income:     $ 365,337.28
FYE 6/30/80
1.
Archie "Woody" Moore
Cash Received
1979: $ 110,000/2 $ 55,000.00 Feb. 1980--"Belfast Lady II" and "Lady Lisa II"   140,000.00
$ 195,000.00
Amts. reported by Trawlers
8/16/79 $ 508.80    Total unreported cash
$ 194,491.20
2.
Ken Kiken
Cash Received
1980: "Elizabeth Ann" $ 75,000.00 1979: $ 170,000/2 "Freddie J" 85,000.00
1979 (maintenance) $ 200,000/2  100,000.00
1979/1980--extras on "Miss Suzanne"   100,000.00
1980 (maintenance) $ 200,000/2  100,000.00
fuel (3 boats) 30,000.00
$ 490,000.00
Amts. reported by Trawlers
8/21/79 $ 2,000.00  4/04/80 37.50
$ 2,037.50  Total Unreported Cash:
$ 487,962.50
3.
Gene Culmer
Cash Received
$ 100,000/4 yrs. $ 25,000.00 Cash reported by Trawlers
2/12/80 $ 22,533.00 Total Unreported Cash:
$ 2,467.00  4.
William "Billy" Wells
Cash Received
$ 200,000/4 years $ 50,000.00 Cash Reported
0     Total Unreported Cash:
$ 50,000.00 5.
Scrap Metal
Cash Received
$ 21,000/17 months per month $ 1,235.30  8/79 - 6/80   $ 13,588.30 Cash Reported
0     Total Unreported Cash:
$ 13,588.30 6.
Vending Machines
Cash Received
$ 20,000/108 months $ 185.19/mo x 12   $ 2,222.28  Total Unreported Cash:
$ 750,731.28
(Corporate Expenditures)
1.12 trucks/4 years @ $ 700 per truck   ($ 2,100.00)  2.6 paintings/3 years @ $ 300 per painting   (600.00)    Unreported income     $ 748,031.28
*222 APPENDIX II O'Neal's Unreported Cash Income
1979
1.
Archie "Woody" Moore
Cash Received
1979-" Belfast Lady I" $ 90,000.00 1979-maintenance on "Carl Moore" and   "Lady Lisa"   110,000.00
$ 200,000.00
Amts. reported by Trawlers
1/17/79 37,960.00
4/10/79 15,225.00
8/16/79 508.80
$ 53,693.80 Total Unreported Cash:
$ 146,306.20
2.
Ken Kiken
Cash Received
1979 "Freddie J" $ 170,000.00
1979 (maintenance) 200,000.00
fuel (2 boats) 20,000.00
1979-extras on "Miss Suzanne" $ 100,000/2   50,000.00
$ 440,000.00
Amts. reported by Trawlers
8/21/79 $ 2,000.00  Total Unreported Cash:
$ 438,000.00
3.
Gene Culmer
Cash Received
$ 100,000/4 yrs.   $ 25,000.00 Cash reported by Trawlers
1/31/79 $ 2,000.00  1/31/79 2,000.00
$ 4,000.00  Total Unreported Cash:
$ 21,000.00  4.
William "Billy" Wells
Cash Received
$ 200,000/4 years $ 50,000.00 Cash Reported
0     Total Unreported Cash:
$ 50,000.00 5.
Scrap Metal
Cash Received
$ 21,000/17 months per month $ 1,235.30  8/79 - 12/79   $ 6,176.50  Cash Reported
0     Total Unreported Cash:
$ 6,176.50  Total Unreported Cash:     $ 661,482.70 (Corporate Expenditures)
1.12 trucks/4 years @ $ 700 per truck   ($ 2,100.00)  2.6 paintings/3 years @ $ 300 per painting   (600.00)    $ 658,782.70 1/2 Unreported Cash:     $ 329,391.35 1980
1.
Archie "Woody" Moore
Cash Received
Feb. 1980-"Lady Lisa II"   and "Belfast Lady II"   $ 140,000.00
Amts. reported by Trawlers
1980 0     Total Unreported Cash:
$ 140,000.00
2.
Ken Kiken
Cash Received
1980-"Elizabeth Ann" $ 75,000.00 1980 (maintenance) 200,000.00
fuel (3 boats) 30,000.00
1980-extras on "Miss Suzanne" $ 100,000/2   50,000.00
$ 355,000.00
Amts. reported by Trawlers
4/4/80 $ 37.50     10/6/80
621.16
$ 621.16    Total Unreported Cash:
$ 354,341.34
3.
Gene Culmer
Cash Received
$ 100,000/4 yrs. $ 25,000.00 Cash reported by Trawlers
2/12/80 $ 22,533.00 Total Unreported Cash:
$ 2,467.00  4.
William "Billy" Wells
Cash Received
$ 200,000/4 years $ 50,000.00 Cash Reported
0     Total Unreported Cash:
$ 50,000.00 5.
Scrap Metal
Cash Received
$ 21,000/17 months per month $ 1,235.30  1/80 - 12/80   $ 14,823.60 Cash Reported
0     Total Unreported Cash:
$ 14,823.60 6.
Hemmingway
Received $ 90,000;
to Smeaton $ 61,000 Total Unreported Cash:
$ 29,000.00 Total Unreported Cash:     $ 590,631.94 (Corporate Expenditures)
1.12 trucks/4 years @ $ 700 per truck   ($ 2,100.00)  2.6 paintings/3 years @ $ 300 per painting   (600.00)    $ 587,931.94 1/2 Unreported Cash     Total 1980 Amount     $ 293,965.97 *223 Footnotes
1. All of the nonfraud issues have been settled in the cases at both docket numbers, including the so-called Meyerhoff/"The Moose" issue, which was severed and tried in a separate trial. Stipulations of Settled Issues have been filed in both docket numbers to reflect the settlements. ↩
2. Petitioners O'Neal have conceded the innocent spouse issue under sec. 6013(e). However, respondent did not determine a fraud addition with respect to petitioner Pearl W. O'Neal.↩
3. Jerry D. Thompson was originally a petitioner in this consolidated case, but settled his case after the trial. ↩
4. Jerry D. Thompson was not related to Joseph T. Thompson or to John Marcus Thompson, who is referred to later in these findings of fact.↩
5. Occasionally she was not available and other individuals would prepare the deposit slips.↩
6. See generally 31 C.F.R. sec. 103.22 (1979)↩.
7. On Sept. 21, 1981, Moore pled guilty to one count of importing marijuana, in violation of 21 U.S.C. sec. 952(a), two counts of attempted income tax evasion, in violation of 26 U.S.C. sec. 7201, and one count of engaging in a conspiracy to defraud the United States by impeding the functions of the Internal Revenue Service, in violation of 18 U.S.C. sec. 371↩.
8. Thompson had personal knowledge that Culmer was engaged in drug smuggling.↩
9. O'Neal testified later in the trial that he did not report this money because he did not intend to keep it. At his change of plea hearing on March 18, 1983, however, O'Neal admitted that he did intend to keep this money.↩
10. That explanation is at odds with his testimony in this Court that he was keeping the $ 35,500 as "evidence" and that he was conducting his own little investigation of Thompson. O'Neal's efforts to explain away his incriminating statements in the taped conversations with Thompson as part of his purported personal investigation of Thompson were wholly incredible. The Court did not believe him.↩
11. We note that the plea agreement between Thompson and the United States does not encompass immunity from civil tax liability. The agreement specifically provides that it "does not restrict the right of the Internal Revenue Service to make any proper civil collection of taxes owed, if any." While Thompson settled his case after the consolidated trial, at the time he testified in this case, he had a strong financial motive to try to minimize the amount of unreported cash income he diverted from Trawlers and split with O'Neal.↩
12. Cf. Alisa v. Commissioner, T.C. Memo. 1976-255↩.
13. Some undetermined amount of unreported corporate income was used for travel expenses of the officers. However, the officers, O'Neal and Thompson, also received constructive dividend income in the form of personal use of corporate vehicles. These amounts are relatively small and we treat these items as a wash.↩
14. Another holding in the Benes case in regard to constructive dividends has been overruled by this Court in Truesdell v. Commissioner, 89 T.C. 1280, 1301 (1987). That is unrelated to the principle for which Benes↩ is cited herein.